# Exhibit A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

- - -

BROADWOOD INVESTMENT FUND, )
LLC, BY AND THROUGH BROADWOOD )
INVESTMENT HOLDINGS, LP, )
ITS TAX MATTERS PARTNER, )
                         )
            Petitioner,  )
                         )
    vs.                  )   No.:   SA CV08-0295 DOC
                         )           (ANx)
UNITED STATES OF AMERICA, )
                         )
            Respondent.  )
_ _ _ _ _ _ _ _ _ _ _ _ _ )

DEPOSITION OF

PAUL JAMES IRVING

COSTA MESA, CALIFORNIA

AUGUST 14, 2012

Atkinson-Baker, Inc.
Court Reporters
www.depo.com
(800) 288-3376

REPORTED BY:  ANGELIQUE MELODY FERRIO, CSR NO. 6979

FILE NO:      A607480

1

providing, working on this litigation?

MR. LINDQUIST: Let me ask the question.

BY MR. LINDQUIST:

Q. Do you know when this analysis of stock sales from 1998 was prepared?

MR. LEVINE: Objection, vague, by who.

BY MR. LINDQUIST:

Q. Do you know when this analysis of stock sales that you looked at, do you know who it was prepared by?

A. It was prepared by my, my partner.

Q. And was it prepared prior to your engagement to testify as an expert in this matter?

A. No.

Q. That analysis of stock sales, for what period did it cover for Mr. Nicholas?

A. 1998 through 2004.

Q. And do you know where your partner got the information for purposes for compiling that report?

A. From his tax returns.

Q. Were all the stock sales, to your knowledge, reported from 1998 to 2004 reported on Mr. Nicholas' personal tax return?

A. To my knowledge, yes.

Q. Was the income from those sales reported on any of Mr. Nicholas' entities to your knowledge?

38

Q. Were you involved in preparing the 2003 Form 1065 for an entity called Camber Investments, L.P.?

A. Yes.

Q. And do you know if any of the stock sales by, on behalf of Mr. Nicholas were reported on that return?

A. I don't recall.

Q. Did you look at that for the purposes of preparing a report in this matter?

A. Because everything is a flow through, all the entities flow through to Dr. Nicholas' individual tax return, my focus was not so much on where the stock was sold, out of which entities, because it was ultimately reported on his individual, on his Form 1040.

Q. Can you answer my question.

For purposes of preparing your return, did you look at the 2003 Form 1065 for Camber Investments, L.P. to see what stock was sold in that term?

A. I don't recall.

Q. And if I understand your testimony, you don't think that it's relevant because everything would flow through to Mr. Nicholas' return; is that basically your analysis?

MR. LEVINE: Objection, misstates the testimony, vague and ambiguous. Go ahead, you can answer.

40

invested in distressed assets or does it mean that somehow I was involved as part of my work product with non-performing loans?

BY MR. LINDQUIST:

Q. Okay. I'll try to clarify it.

Had you ever analyzed non-performing loans in the course of your work prior to your engagement in this matter?

A. No.

MR. LEVINE: Objection, vague.

MR. LINDQUIST: I'm sorry. I didn't hear the answer.

MR. LEVINE: You can answer.

THE WITNESS: No.

BY MR. LINDQUIST:

Q. Prior to your engagement in this matter, had you ever been aware of any of your clients having invested in non-performing loans in China?

A. No.

Q. Prior to this matter had you ever been aware of any of your clients who had invested in distressed assets in Korea?

A. No.

Q. Prior to this matter had you ever been aware of any of your clients who had invested in any distressed

44

BY MR. LINDQUIST:

Q. Had you ever -- were these names that were familiar to you in your work?

A. They were familiar in name only from our prior work with Dr. Nicholas.

Q. And did you for purposes of preparing the report do any research with respect to any of those assets that are listed in that table on page six of your report?

A. Research as it relates to what?

Q. To determine what type of distressed assets, what makes those assets distressed assets?

A. We relied on classification from the Nicholas office when they listed out their different investments, they noted these as being either distressed or capital structure arbitrage or fixed income arbitrage.

Q. When you say "these", they listed these particular ones as any of those three classifications?

A. Correct.

Q. And did they list all of them as distressed assets?

MR. LEVINE: Objection, vague, asked and answered.

BY MR. LINDQUIST:

Q. All of the names that you have in this table,

49

that amount been paid?

A.   It has not.

Q.   Does the next page reflect accurately the time spent by you during that time period?

A.   Yes.

Q.   Now on that page it reflects certain time spent reviewing the Colby report; do you see that?

A.   Yes.

Q.   Do you have any background in economics?

A.   No.

Q.   Have you ever taken any economic courses?

A.   Yes.

Q.   When was that?

A.   When I was doing my undergraduate studies.

Q.   And since that time have you taken any economic courses?

A.   No.

Q.   Did you read the entire report by Dr. Colby, his internal report?

A.   No.

Q.   What portions of it did you read?

A.   I read the portions of the report that were pertinent to my rebuttal.

Q.   And what portions were those?

A.   The portions talking about fees paid by

Dr. Nicholas.

Q. Did you undertake to examine what fees had, in fact, been paid by Dr. Nicholas with respect to the transactions at issue in this matter?

A. I have reviewed documentation for the fees that I know of. I don't know if it was -- I can't be certain if it was all-inclusive.

Q. My question, is did you undertake to examine the fees that had been paid with respect to the transaction that are at issue in this litigation?

A. Did I undertake to, yes.

Q. And what did you do to perform that undertaking?

A. I reviewed documents. I reviewed tax returns.

Q. Was your focus -- can you explain to the court why you were looking at tax returns?

A. I was looking at tax returns for deductions that he took for advisory fees.

Q. Did you undertake to examine what fees were proposed to be paid as of the date of the original contract in December of 2001?

MR. LEVINE: Objection, vague, foundation, but you can answer, if you can.

THE WITNESS: No, I did not review those documents.

67

BY MR. LINDQUIST:

Q. And what documents specifically are you talking about when you say that you did not review those documents?

A. The ones that you're referring to in December of 2001.

Q. Did you review any of the proposals for services that were prepared by My C.F.O.?

A. Yes.

Q. Do you remember anything in particular about those?

A. My recollection is that there were, there was a listing of a variety of services as proposed by My C.F.O.

Q. And how many of those proposals -- how many of those proposals for services did you review?

MR. LEVINE: I'm going to object that it's vague to the term proposals for services.

BY MR. LINDQUIST:

Q. You can answer.

A. I reviewed one proposal for services.

Q. And which one is that?

A. It was one that totalled roughly $3.5 million.

Q. And what specifically are you referring to that totalled $3.5 million?

as well.

Q. In your summary there you say, based upon my review of Dr. Nicholas' individual returns?

A. Uh-huh.

Q. So is it -- in addition, did you look at the entity returns flowing into Dr. Nicholas' returns?

A. I may have looked at some, but again, because these are all flow-through entities everything eventually, if there were losses taken, gains taken, any sort of income or loss at the underlying entity level, it would have been reflected in Dr. Nicholas' individual returns.

And I did not see any losses from the distressed asset investments taken on his individual return.

Q. Did you -- you yourself had signed some of the entity returns flowing into Dr. Nicholas' returns for those years; hadn't you?

A. Yes.

Q. Now at the time that you signed those returns, for instance, the returns for the 2003 tax year for Camber Investments, L.P., at that time that you signed that return, were you aware of any reporting of a flow through of a tax loss from any of the Dragon transactions at issue in this litigation?

80

A.   I recall that there were some losses coming from underlying investments held by Camber, but those losses never were reported on Dr. Nicholas' tax returns.

Q.   But you signed a return at least as to Camber Investments, L.P., for 2003, you remember that and that, and that return included a flow through of a tax loss from one of the Dragons transactions?

A.   I'd have to go back and look at the 2003 Camber return to verify that.

Q.   Did you ever discuss with anyone in your office whether or not this structure that had been created for the purposes of reporting the Dragons transactions whether that was intentionally structured to optically conceal these transactions from the I.R.S.?

MR. LEVINE:   Objection, vague as to time, foundation.

BY MR. LINDQUIST:

Q.   At anytime?

A.   I had no discussions.

Q.   Were you shown any of the E-mails that were marked in the course of the depositions in this matter concerning the planned optics for the reporting of the tax losses from these transactions?

MR. LEVINE:   Objection, foundation, over broad.

THE WITNESS:   I don't recall.  I'd have to look

81

filing of an extension for the 2002 tax year for Camber Investments, L.P.?

A.    I don't believe so based on our engagement beginning in the summer of 2003, but I would have to look.

Q.    Let me show you what has been marked as Exhibit 52 in this matter.  This was previously marked.

A.    Okay.

Q.    This is an E-mail dated December 12, 2001, from Mr. Gunther to Mr. Nicholas.

Have you ever seen this E-mail before?

A.    No.

Q.    It's not listed on your attachment as Exhibit B.  You were asked to review the expert report prepared by Dr. Colby in that review.

Did you ask to see any of the documents that Dr. Colby cited to in his report with respect to the fee structure for the transactions at issue in this litigation?

A.    No.

Q.    Why not?

A.    Well, my recollection is that Dr. Colby's report seemed to make some assumptions of fees paid. There was one chart in particular where it talked about actual fees paid in a particular year.

And then in subsequent years, they didn't say actually paid, but more of a, it seems to me of assumed to have been, I want say, assumed to have been paid.

In some subsequent years he showed a fee that was -- that did not definitively show that those fees were actually paid. It seemed to be more of an assumption on his part.

Q. Is it, in your view, were you asked to only look at those fees that were, in fact, definitively paid?

A. In my opinion those are the only, that's the only thing that matters is what was actually paid.

Q. Why is that?

A. Because proposed is just that, proposed.

Q. All right. Well, what about looking for those fees that were due to be paid as of December of 2001, did you look at that?

A. I was more focused on fees that were actually paid.

Q. Did the fees in the transactions at issue in this case have any impact on the conclusion in your report?

MR. LEVINE: Objection, vague, but you can answer. You can answer if I object, unless I instruct you not to answer the question.

95

$17 million; do you see that?

A. Yes, I do.

Q. And you can see that it lists the fees for Tranche one as due in 12/01 and Tranche two as 12/02 and Tranche three in 12/03; do you see that?

A. Yes.

Q. Now, did you make any inquiry for purposes of preparing your rebuttal report as to whether or not there was any negotiation concerning the payment of the fees that had been deferred to later years?

MR. LEVINE: Objection, foundation.

THE WITNESS: No, I didn't.

BY MR. LINDQUIST:

Q. And you didn't recall reading anything about that in any of the depositions that you perused?

A. I don't recall that.

Q. One of the deposition transcripts that you perused was the Gunther deposition transcript.

And you don't recall seeing that as an issue that was the subject of Mr. Gunther's testimony?

A. I don't recall seeing that. I'd have to go back and look at it. Again, my interest would be more were these figures actually paid or not.

Q. And for purposes of determining whether they were, in fact, paid, did you examine all of the entities

that Dr. Nicholas owned or controlled in 2002 and 2003?

MR. LEVINE:  Objection, vague, over broad.

THE WITNESS:  One more time.

BY MR. LINDQUIST:

Q.  Did you examine all of the entities that Dr. Nicholas owned or control in 2002?

A.  For fees?

Q.  As to whether or not he made any of these payments through one of the entities that he owned or controlled; did you look for that?

A.  I looked at what I had.  And if I could identify fees, I would identify fees.  For instance, if you look at his, and I talk about this in my report.

He had a lot of professional fees on his individual income tax return, some of which flowed up from K-1's.  In fact, in some years I think they were over $5 million.

It's not uncommon for a very high net-worth individual to pay fees in that range, but I don't know what, if any, of those fees that I saw had anything to do with any of these transactions.

Q.  Okay.  Did you see any in your perusal of the transcripts, did you see any testimony concerning the negotiation of a fee agreement between Mr. Nicholas and Chenery which would have provided that the payment of

A.  I would have considered it for my report, yes.

Q.  And you said that you would have to look at his personal return?

A.  And also the underlying, where the $72 million loss comes from as well.  So, I have something above and something below.  I have Dr. Nicholas' return and then I have the source of this capital loss.

Q.  Now, do you recall looking at a loss of some $72,356,213 for 2003 flowing through the Camber Investments, L.P. return?

A.  To?

Q.  To prepare your report; do you recall that specifically looking at that loss?

A.  What I looked at was what was reported on Dr. Nicholas' tax return.

Q.  Optically, can you tell from this return that you prepared, Exhibit 2112, can you tell where that loss is coming from that is on Schedule D, line nine?

MR. LEVINE:  Foundation, vague, foundation.

THE WITNESS:  No.  It's not evident.

BY MR. LINDQUIST:

Q.  Do you disclose in any way, shape or form on this return that there's a loss coming from a D.A.D. tax shelter transaction?

MR. LEVINE:  Objection, foundation.

140

BY MR. LINDQUIST:

Q.   A Distressed Asset Debt transaction?

MR. LEVINE:   Same objection.

THE WITNESS:   No.   I don't reflect that.   I don't know where that loss came from.

BY MR. LINDQUIST:

Q.   At the time that you prepared this return, do you think you knew where this, do you think that you knew where this loss came from?

A.   Probably.

Q.   I mean, it's not an insignificant amount in your world, even if you do you have high net-worth clients; right?

MR. LEVINE:   Objection, vague.

THE WITNESS:   If there was a reporting to be done, it would be done at the level of where the loss was taken.   This is a flow through.

BY MR. LINDQUIST:

Q.   Well, it's also a netting.

So, if it nets out against the income, it's not the loss that is effectively being taken on this return at least?

A.   If this is a non-taxable entity, so, there's a loss being presented here.   I don't know if that loss, I'll have to look to see if that loss actually made it

to the Nicholas return.

Q. Well, what about whether the income that is being netted on this schedule, do you know if that income of $52,860,522 whether that made it to the Nicholas income tax return?

A. We'd have to look at the Nicholas income tax return.

Q. If it was being netted on this return against a loss, how would it make it to the Nicholas income tax return?

A. The Nicholas income tax return would have a similar looking Schedule D. And also with a line item saying income or loss from other partnerships.

So, this $19,495,691, in totality, if the loss is reflected on the Nicholas tax return would show up on a line similar to this line nine.

Q. And on that line nine would it reflect the fact that there had previously been a netting against some 52 million of capital gains?

A. No. The net number just comes through.

Q. So, absent that loss, Mr. Nicholas should be reporting a capital gain of $52,860,522 on his personal return; is that your testimony?

A. As a long-term capital gain, yes, from Camber it would show up in two different pieces because there

142

are two K-1's.

Q. So, one is going to flow through N.S. Holdings, L.L.C.?

A. Right. And N.S. Holdings is owned by -- I'm sorry. I didn't mean to interrupt.

Q. Go ahead. N.S. Holdings is owned by who?

A. Dr. Nicholas. So, it would all end up in his return.

Q. Was that N.S. Holdings only owned by Dr. Nicholas?

A. I don't believe that it's a single member L.L.C. or I don't believe that it was, but I'd have to take a look. There may have been another small part here.

Q. And the part for the Nicholas family trust, would that part of it is going to flow through the Nicholas family trust; is that correct?

A. The Nicholas family trust is a grantor trust. You'll notice that the identification number there is Dr. Nicholas' social security number.

So, there's not a separate tax return for a grantor trust. So, these numbers effectively with go directly to Dr. Nicholas' Form 1040.

Q. So when I previously asked about the Nicholas family trust and you said it would depend upon whether

143